# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RICARDO IGNACIO GILL,

      Plaintiff,

v.                                                      Case No.  3:20-cv-535-MMH-LLL

MARK INCH, et al.,

      Defendants.

_____

# **ORDER**

## **I. Status**

Plaintiff Ricardo Ignacio Gill, a death-sentenced inmate in the custody of the Florida Department of Corrections (FDOC) and housed at Union Correctional Institution (UCI), initiated this action by filing a pro se Civil Rights Complaint (Doc. 1; Complaint) under 42 U.S.C. § 1983. Gill sues these Defendants: (1) Mark Inch, former Secretary of the FDOC; (2) John Palmer, Director of Institutions of Region II; (3) Barry Reddish, Warden of Florida State Prison (FSP); (4) Jeffery McClellan, Assistant Warden of FSP; (5) Travis Lamb, Warden of UCI; (6) Tifani Knox, Assistant Warden of UCI; (7) Richard Andrews, Classification Supervisor at UCI; (8) J. Lindsey, Colonel at UCI; and

(9) E. Biascochea, Major at UCI.[1] Id. at 2-6. Gill asserts that Defendants have continuously placed him in non-contact visitation status under Florida Administrative Code Rule 33-601.735 in violation of his Fifth and Fourteenth Amendment due process rights.[2] Id. at 9.

This matter is before the Court on Defendants Inch, Palmer, Reddish, McClellan, Lamb, Knox, Andrews, Lindsey, and Biascochea's Motion for Summary Judgment. See Defendants' Motion for Summary Judgment (Doc. 83; Motion), with exhibits (Doc. 83-1 through Doc. 83-25; Motion Exs. A-Y). The Court advised Gill of Federal Rule of Civil Procedure 56, notified him that granting a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and allowed him to respond to the Motion. See Order of Special Appointment (Doc. 7). Gill filed a Response opposing the Motion, see Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment (Doc. 89; Resp.), with an exhibit (Doc. 89-1; Resp. Ex.); a Supplemental Response, see Supplement to Summary Judgment Response (Doc. 93; Supp. Resp.), with exhibits (Docs. 93-1 through 93-5; Supp. Resp. Exs. A-E); and a Second

---

[1] Gill also named J. Falk, Assistant Warden of UCI, as a defendant, but the Court has dismissed Gill's claims against Falk and terminated him as a Defendant. See Doc. 42.

[2] Gill also references the Equal Protection Clause of the Fourteenth Amendment, but his equal protection allegations are intertwined with his due process claim.

Supplemental Response, see Second Supplemental Motion in Opposition of State's Motion for Summary Judgment (Doc. 95; Second Supp. Resp.), with exhibits (Docs. 95-1 through 95-4; Second Supp. Resp. Exs. A-D). The Motion is ripe for review.

## II. Gill's Allegations[3]

In his Complaint, Gill alleges that Defendants, each in their individual and official capacities as "member[s] of the Institutional Classification Team [(ICT)]," violate his Fifth and Fourteenth Amendment due process rights by arbitrarily imposing and continuing to impose on Gill a non-contact visitation policy that does not apply to him. Complaint at 6-16.[4] Gill explains that under Florida Administrative Code Rule 33-601.735, the warden, upon the ICT's recommendation, may temporarily place an inmate "in [s]egregated/[n]on-[c]ontact visitation status in order to maintain the security and good of the institution." Id. at 7. Gill contends that if the warden approves the ICT's recommendation to place an inmate on non-contact status, that inmate is "not allowed to hug, touch, kiss, and enjoy the basic human need of having physical contact that [is] enjoyed by other similarly situated inmates." Id. at 8.

---

[3] For the purposes of resolving Defendants' Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Gill. However, the Court notes that these facts may differ from those that ultimately can be proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

[4] In his Response, Gill clarifies that he sues each Defendant in their official and individual capacities. Resp. at 2.

According to Gill, because of the stringent nature of non-contact conditions, prison officials may only place an inmate on non-contact status temporarily and must review the inmate's visitation status every six months to ensure the inmate is in the least restrictive environment to meet legitimate security concerns. Id. He states that anything beyond those least restrictive means "constitute[s] extraordinary circumstances which are not considered incidental to the normal types of conditions experienced by individuals in prison." Id. at 8-9. Gill alleges that as a member of the ICT, each Defendant has "specific authority and responsibilities relative to the operation and management of the Inmate Classification System," including "making [i]nmate status decisions" and placing inmates under non-contact status. Id. at 2-6.

Gill maintains, however, that Defendants have violated his procedural due process rights when continuing him on non-contact status under Rule 33-601.735. Id. at 16. According to Gill, Defendants rely on the "the vagueness of [this Rule to] subject[] [him] to atypical and significant hardships for an extended period of time without any definite time limitations." Id. To support this allegation, Gill asserts that Defendants have a custom, policy, and practice of misapplying Rule 33-601.735 and using non-contact visitation as a long-term punitive, unregulated, and unchallenged means to deny Gill contact visitation even though Gill has not engaged in the enumerated prohibited conduct that would warrant the imposition of the restrictive condition. Id. Gill explains

4

Defendants have routinely adhered to this unconstitutional policy and practice of arbitrarily placing him on non-contact visitation status for sixteen years "at various times from July 27, 2004 up to present" day. Id. at 6, 9. Gill also argues Defendants failed to conduct the required six-month reviews of his non-contact status for "11 ½ years, from July 19, 2005 to January 19, 2016," and the criteria on which Defendants relied to continue his non-contact status afterward ignored the requirements of Rule 33-601.735. Id. at 15.

To demonstrate the punitive and capricious nature of the visitation restrictions Defendants place on him, Gill notes that Defendants have occasionally allowed him to enjoy contact visits on a "case-by-case basis," and Defendants know Gill exhibited exemplary behavior during those contact visits. He also maintains that prison officials know he is permitted to participate in open recreation with seventy-five other inmates without incident. Id. at 15. But despite Gill's ability to amicably coexist in prison's open population, Defendants arbitrarily and routinely find Gill a security threat and prohibit him from enjoying contact visits with his loved ones without justification or supporting evidence. Id. Gill asserts that he is forced to visit with his family and friends through glass barriers while other similarly situated inmates are allowed human contact with their visitors. Id. Gill argues that by engaging in this practice, Defendants have hindered his ability to carry on "the ordinary affairs of life in the same manner and in a like extent had he

not been subject to the unconstitutional conduct of Defendants . . . ." <u>Id.</u> at 20. He explains that as a direct and proximate result of Defendants' practice and policies, he has and will continue to suffer "physical and mental anguish." <u>Id.</u> at 19-20. As relief, Gill requests a declaratory judgment finding Defendants' use of the non-contact policy unconstitutional as applied to him and enjoining Defendants from enforcing the non-contact visitation policy against him now and in the future. <u>Id.</u> at 22-23. He also seeks $16,000 in punitive damages from each Defendant and an award of costs.[5] <u>Id.</u> at 21-22.

### III. Standard of Review for Summary Judgment

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v.</u>

---

[5] The Court dismissed Gill's request for compensatory damages. <u>See</u> Doc. 42.

Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571,

1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

### IV. Florida Administrative Code Rule 33-601.735

This case involves the application of Florida Administrative Code Rule 33-601.735, which states:

> (1) For purposes of this rule, non-contact visiting is a form of "in person" visitation and does not include video visitation as defined in Rule 33-602.901, F.A.C.
>
> (2) When the Institutional Classification Team (ICT) determines that non-contact visiting is necessary in order to maintain the security and good order of the institution, the ICT shall make a recommendation to the warden who shall approve or disapprove the recommendation.
>
> (3) The ICT shall consider the following factors in determining whether to place an inmate in non-contact status:
>
> > (a) Whether the inmate is a threat to the security of the institution,
> >
> > (b) The inmate's and his or her visitors' past behavior during visiting,
> >
> > (c) The inmate's disciplinary history within the last five years involving drugs, contraband, violence, or visiting policy violations,

8

(d) Evidence or intelligence reports that an inmate has possessed, sold, or transferred drugs, alcohol, or money,

(e) Whether the inmate has a confirmed membership in a security threat group, and

(f) A positive drug or alcohol urine test.

(4) The ICT shall review non-contact visiting status a minimum of every six months to evaluate whether changes are necessary based upon the following:

(a) The seriousness of the incident or circumstances resulting in placement in non-contact status,

(b) The inmate's history of repeated placement on non-contact status,

(c) The inmate's overall adjustment history since placement in non-contact status, and

(d) The inmate's disciplinary history during the last year involving drugs, contraband, violence, or visiting policy violations.

Fla. Admin. Code R. 33-601.735(1),(2),(3)(a)-(f),(4)(a)-(d).

## V. Evidence

Gill was first in FDOC custody from 1987 to 1998 and during that time, prison officials found him guilty of conduct resulting in seventy-two

disciplinary reports (DRs).[6] Motion Ex. S at 5. Because of the "excessive" number of DRs, officials placed Gill on close management one (CMI) status in July 1996 and he remained on CMI until his release in August 1998. Motion Ex. W at 1. CMI is the most restrictive of the close management designations and inmates on CMI status are limited to non-contact visitations. Fla. Admin. Code R. 33-601.800(11)(b)6d.

Gill reentered FDOC custody and began serving a life sentence at Northwest Florida Reception Center in July 2001. Motion Exs. D at 21-22; W at 1. On July 24, 2001, Gill murdered his cellmate.[7] Motion Ex. W at 1. Immediately after the murder, officials transferred Gill to FSP, and Gill has been housed at either FSP or UCI since that date. Motion Ex. W at 1. In August 2001, officials at FSP placed Gill on CMI based on his involvement in his cellmate's homicide. Id. Gill remained on CMI from August 2001 until 2004. Motion Ex. D at 55-58.

Between December 2001 and May 2019, Gill accrued 196 DR convictions. Motion Exs. C, X. On July 27, 2004, while housed at UCI, the ICT, for the first time, recommended Gill be placed on non-contact visitation status under Rule

---

[6] Gill's seventy-two DRs from 1987 through 1998 are not part of the record, but Gill does not dispute this fact. See Resp. at 2.

[7] Gill ultimately entered a guilty plea to first degree murder of his cellmate and the state court (Union County, Florida) sentenced Gill to death in 2006. Motion Ex. A at 13-38.

33-601.735. Supp. Resp. Ex. B at 2; Motion Ex. D at 55-58. On that date, the ICT sent Gill a written notice advising of its recommendation to place him on non-contact visitation status based on Gill obtaining a "Disciplinary Report for (9-26) Refusing to submit to substance abuse testing." Supp. Resp. Ex. B at 2. In his deposition, Gill testified that the warden approved the ICT's recommendation in July 2004, and he has remained on non-contact visitation status since that approval. Motion Ex. D at 55-58.

The ICT conducted a six-month review of Gill's non-contact status in January 2005 and according to the ICT log, officials continued Gill's non-contact status. Motion Ex. W at 11. In May 2005, Gill received a DR conviction for attempting to stab an officer with a homemade knife. Motion Ex. C at 5. Officials immediately transferred Gill to FSP and placed him on maximum management (MM) status. Motion Ex. W at 5-6. MM "refers to a temporary status for an inmate who, through a recent incident or series of recent incidents, has been identified as being an extreme security risk to the Department and requires an immediate level of control beyond that available in confinement, close management, or death row." Fla. Admin. Code R. 33-601.820(1)(b). The ICT must review an inmate's MM status at least monthly and inmates on MM are limited to non-contact visitations. Fla. Admin. Code R. 33-601.820(6)(a); Fla. Admin. Code R. 33-601.733(5).

In August 2005, after providing Gill notice and an opportunity to participate, the ICT at FSP (which included Defendant McClellan) conducted a classification review hearing, recommended Gill continue MM status, and suggested he receive a CMI classification because of "his assaultive behavior, attempt[] to stab officer at UCI and extensive history of disruption of the institution." Motion Ex. W at 6. The State Classification Office approved the ICT's recommendation. Id.

The ICT log indicates Gill then remained on MM status between August 2005 and January 2009. Motion Ex. W at 45-54. The ICT log includes no record of an ICT classification hearing between September 2005 and November 2006. See generally Motion Ex. W. But a review of Gill's state court criminal docket in State v. Gill, No. 63-2002-CF-0028-A (Fla. 8th Cir. Ct.), shows that the state court entered several transport orders between June 2005 and June 2006 for Gill to participate in his capital sentencing proceedings.[8] The state court conducted part of Gill's penalty phase hearing on September 30, 2005, and sentenced Gill to death in open court on June 30, 2006. Id. Gill was present for both hearings. Id.

---

[8] The Court takes judicial notice of Gill's state court docket. See McDowell Bey v. Vega, 588 F. App'x 923, 927 (11th Cir. 2014) (holding that district court did not err in taking judicial notice of the plaintiff's state court docket when dismissing § 1983 action); see also Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice.").

The ICT log shows that between December 2006 and November 2008, the ICT at FSP (which sometimes included McClellan) conducted monthly evaluations of Gill's classification status and each month recommended Gill remain on "status of [MM] to maintain the safety and security of the institution." Motion Ex. W at 45-53. And each month, the regional director approved Gill's continued placement on MM. Id.

On December 8, 2008, the ICT conducted another monthly review and recommended Gill be released from MM status. Id. at 53. The ICT explained, "inmate placed on [MM] on 5-25-05 due to his att[]empted assault on staff at UCI . . . . [Gill] has received 74 [DRs] since his placement on 5-25-05. Several of these assaults were on staff and threats towards staff. His last [DR] was on 1-4-2008 for assault/att/co. attempted to throw an unknown substance on a correctional officer." Id. at 53. The ICT stated, however, that because Gill had been granted property privileges and yard privileges with no issue, it recommended release from MM. Id. Officials approved the ICT's recommendation and released Gill from MM on January 26, 2009 and moved Gill to "death row/solid door housing." Id. at 54. "Death row visits shall be contact visits unless security concerns indicate that a non-contact visit is necessary, in which case the non-contact visit shall be approved by the warden in advance." Fla. Admin Code R. 33-601.830(7)(l).

In July 2009, classification officials (including McClellan) placed Gill in administrative confinement (AC) because Gill obtained five DR convictions between May and June 2009, resulting in Gill receiving 135 days of disciplinary confinement with a completion date of October 8, 2009. Id. at 57. AC "refers to the temporary separation of an inmate from inmates in general population in order to provide for security and safety until such time as a more permanent inmate management decision process can be concluded . . . ." Fla. Admin. Code. R. 33-602.220(1)(a). "[A]ll visits for inmates in [AC] must be approved in advance by the warden or designee. . . . Those inmates who are a threat to the security of the institution shall be denied visiting privileges." Id. at R. 33-602.220(5)(i). In October 2009, Gill suffered an aneurysm and was briefly transferred to the Reception and Medical Center (RMC). Motion Ex. D at 74-75; Motion Ex. W at 58. On October 16, 2009, officials at RMC documented Gill as a "[MM] inmate-death row," conducted "an informal hearing," and advised Gill that he would remain in AC pending a classification review as "housing Gill [] in open population could pose a threat to the security and orderly operation of [the] institution." Motion Ex. W at 58.

Gill soon returned to FSP, and on November 30, 2009, the ICT (which included McClellan) reviewed Gill's non-contact visitation status and recommended Gill remain on non-contact visitation status under Rule 33-601.735 "due to [Gill] being [a] security threat." Motion Ex. W at 36. The ICT

conducted additional reviews of Gill's non-contact visitation status in June 2010, November 2010, June 2011, January 2012, July 2012, February 2013, August 2013, February 2014, August 2014, January 2015, July 2015, January 2016, July 2016, and January 2017.[9] Id. at 36-38. Defendant Palmer, as warden of FSP, approved the ICT recommendations between July 2012 and January 2017. Id. at 36-38; Motion Ex. S.

Between February 2013 and September 2018, FSP officials approved, and Gill received, thirty-two visits from his mother, father, and pen pals. Motion Ex. Y at 1-4. Also, between 2017 and 2018, the acting warden at FSP (including Defendant Reddish) approved special contact visitations between Gill and his mother and father. Motion Ex. D at 18, 37; Motion Ex. U at 1-2; Supp. Resp. at 5. According to Gill, during his special contact visits, he created no problems and demonstrated exemplary behavior. Motion Ex. D at 37. In support of that argument, Gill provides declarations from nine death row inmates – Eriese Tisdale; Paul Beasley Johnson; James A Duckett; Randall Deviney; Kim Jackson; Chadwick Willacy; Ronald Wayne Clark, Jr.;

---

[9] The ICT log also shows that the ICT recommended Gill be placed in disciplinary confinement several times in 2010 and 2011. Motion Ex. W at 15. And ICT suspended Gill's visitation under Florida Administrative Code Rule 33-601.731 in January 2011 and again in February 2011 for Gill's new DR convictions for spoken threats and obscene or profane act. Id. at 17, 60; Motion Ex. C at 12.

Fotopoulous Konstantinos; and Dwight Eaglin. Supp. Resp. Ex. D; Second

Supp. Resp. Ex. A at 7-15. The declarations are identical and each state:

> [I]n the year 2017 and/or 2018, I visited with family, friends and/or children. On 1 (one), or more occasions, and in no shape, form or fashion, was Ricardo Gill, a threat, to me, family, and/or children, while he was at visit with his visitors.
>
> In fact, he showed exemplary positive behavior, that I've not seen since his arrival to death row in January, 2009.

Supp. Resp. Ex. D; Second Supp. Resp. Ex. A at 7-15.

Despite Reddish's approval of special contact visits with his mother and father, Gill testified he otherwise remained on non-contact visitation status under Rule 33-601.735. Motion Ex. D at 37-39. And the ICT log shows that FSP's ICT (including McClellan) conducted six-month hearings and recommended the continuation of Gill's non-contact status based on his extensive disciplinary history in January 2018, July 2018, and January 2019. Motion Ex. W at 30. In February 2019, Gill received a DR conviction for attempting to conspire with an outside party, through a JPAY email, to obtain the address and an aerial view photograph of a classification officer's home. Motion Ex. L at 4-7.

On April 30, 2019, officials transferred Gill to UCI where he remains housed. Motion Ex. D at 35-36. Gill testified in his deposition that after his transfer, UCI officials refused to allow Gill to continue special contact visits

with his parents. Motion Ex. D at 35-36. In May 2019, Gill received a DR conviction for written threats Gill made in another JPAY email. Motion Ex. C at 15; Motion Ex. L at 12. In that email, Gill wrote that when he learned his visiting privileges at UCI would not improve, he got very angry and got the urge to physically hit Defendant Knox. Motion Ex. L at 14. The ICT log shows that the ICT at UCI (including Defendants Knox, Andrews, and Biascochea) conducted a classification hearing in May 2019, and continued Gill's non-contact visitation status because of his threatening history and his April and May 2019 DR convictions. Motion Ex. W at 26.

In October 2019, April 2020, October 2020, and April 2021, the ICT sent Gill written notices stating, in relevant part:

> Subject was continued [on non-contact visiting] at his last review based on continued disciplinary reports to include: 5/15/19, 1-3, Spoken Threats, in accordance with 33-601.735. Subject has not received any further disciplinary reports since the last one of 5/15/19. Subject has shown improvement as notable by only receiving two DRs for the year of 2019, thus far.
>
> He has been reviewed numerous times for non-contact visiting and continuation has always been appropriate due to the safety and security of the institution. Reinstatement of visits could further his improvement.

Second Supp. Resp. Ex. D at 4-6. After each notice, the ICT (including Defendants Knox, Andrews, and Biascochea) conducted a hearing and recommended Gill's continued placement on non-contact visitation status, and

17

the warden (Defendant Lamb) approved each recommendation "based on the safety and security of the institution." Motion Ex. W at 26. Gill provides three more ICT notices dated September 15, 2021; March 7, 2022; and August 11, 2022, which all provide:

> This notice is to advise you in writing of the ICT's recommendation to continue you in Non-Contact Visiting Status due to safety and security concerns of the institution. This continuation complies with F.A.C. Rule 33-601.735.
>
> . . . .

Supp. Resp. Ex. A at 4-6. Gill has not received a DR conviction in over two years, with his May 2019 DR conviction being the last one he received. Motion Ex. D at 69. And since his transfer, UCI officials have approved at least four visits between Gill and his aunt, half-sister, stepmother, and pen pals. Motion Ex. Y at 1.

Defendants McClellan, Palmer, and Reddish participated in Gill's classification reviews as members of the ICT at FSP. See generally Motion Ex. W. In his declaration, McClellan stated:

> In August of 2000, I was promoted to Senior Classification Officer at [FSP]. In 2004, I was promoted to Classification Supervisor at [FSP]. I was transferred to [UCI] in September 2007 and returned to [FSP] in March of 2008. In February 2014 I was promoted to Assistant Warden at [FSP].
>
> I have dealt with Mr. Ricardo Gill, DC #105559 since his arrival at [FSP] on July 24, 2001, in all

> capacities from Senior Classification Officer, Classification Supervisor and Assistant Warden until his permanent transfer to [UCI] on April 30, 2019.
>
> Mr. Gill was placed on non-contact visitation due to being an institutional threat to security as recommended by the [ICT] and approved by the Warden in accordance with FAC 33-601.735(3)(a) and (c) based on his threat to the security of the institution and the inmate's disciplinary history within the last five years involving drugs, contraband, violence, or visiting policy violations.
>
> Since Mr. Gill's transfer to UCI on April 30, 2019, I have not made any decisions concerning Mr. Gill's non-contact visitation status, nor do I have any authority concerning his status. Mr. Gill's non-contact visitation status is determined by the ICT and Warden where he is currently incarcerated.
>
> . . . .

Motion Ex. Q (paragraph enumeration omitted).

In his declaration, Defendant Palmer explained that since 1990, he has worked for several FDOC facilities including FSP and UCI, and he occasionally participated in Gill's classification decisions either as a member of the ICT at UCI or as warden of FSP. Motion Ex. S at 1. Palmer stated:

> From December 2003 through April 2004, I was assigned to FSP as a Major and with oversight of death row inmates, and during this period, Mr. Gill was found guilty of the following seven disciplinary reports:
>
> (a) January 7, 2004 – destruction of state property;
> (b) January 18, 2004 – disorderly conduct;
> (c) February 3, 2004 – disobeying order;

(d) March 5, 2004 – disrespectful to officials;
(e) March 13, 2004 – assault or attempted assault;
(f) March 13, 2004 – assault or attempted assault; and
(g) March 13, 2004 – defacing state property.

From April 2004 through June 2005, I was the Colonel and Head of Security for UCI and during this period, Mr. Gill was found guilty of the following sixteen disciplinary reports:

(a) May 26, 2004 – disrespectful to officials;
(b) June 21, 2004 – possession of weapons;
(c) June 21, 2004 – refusal to submit to substance abuse test;
(d) August 6, 2004 – disorderly conduct;
(e) October 5, 2004 – possession of unauthorized beverage;
(f) October 5, 2004 – refusal to submit to substance abuse test;
(g) October 29, 2004 – disobeying order;
(h) December 18, 2004 – possession of unauthorized beverage;
(i) January 17, 2005 – disrespectful to officials;
(j) January 21, 2005 [–] disobeying order;
(k) February 3, 2005 – spoken threats;
(l) February 25, 2005 – disobeying order;
(m) April 29, 2005 – unarmed assault;
(n) May 2, 2005 – arson or attempted;
(o) May 2, 2005 – tampering with safety device; and
(p) May 14, 2005 – assaulted or attempted.

Pursuant to Chapter 33-601.735(3) of the Florida Administrative Code, I (or my designee), as the Colonel and Chief of Security for UCI (April 2004 through June 2005), reviewed and recommended Mr. Gill's continued placement on noncontact visitation status on the following dates:

(a) August 12, 2004, and
(b) February 4, 2005.

From July 2012 through January 5, 2017, I was the Warden of FSP and Mr. Gill was found guilty of the following twenty-six disciplinary reports:

(a) August 12, 2013 – possession of contraband;
(b) December 5, 2013 – spoken threats;
(c) January 14, 2014 – disrespectful to officials;
(d) August 8, 2014 – disrespectful to officials;
(e) August 15, 2014 – disrespectful to officials;
(f) August 26, 2014 – spoken threats;
(g) October 13, 2014 – disobeying order;
(h) October 13, 2014 – tampering with a security device;
(i) October 17, 2014 – lewd or lascivious exhibition;
(j) November 5, 2014 – spoken threats;
(k) November 6, 2014 – spoken threats;
(l) November 8, 2014 – spoken threats;
(m) November 10, 2014 – battery or attempted battery on correctional officer;
(n) December 5, 2014 – disorderly conduct;
(o) December 5, 2014 – disorderly conduct;
(p) December 5, 2014 – disorderly conduct;
(q) December 19, 2014 – lewd or lascivious exhibition;
(r) January 27, 2015 – fraud or attempted fraud;
(s) May 2, 2016 – disobeying order;
(t) May 2, 2016 – spoken threats;
(u) May 12, 2016 – spoken threats;
(v) June 22, 2016 – spoken threats;
(w) June 28, 2016 – lewd or lascivious exhibition;
(x) July 20, 2016 – attempt to conspire;
(y) July 22, 2016 – spoken threats; and
(z) October 5, 2016 – attempt to conspire.

When I was the Warden at FSP and pursuant to Chapter 33-601.735(3) of the Florida Administrative Code, the ICT reviewed Mr. Gill's non-contact status every six months to evaluate whether changes to his status [were] necessary based on [the factors in Rule 33-601.735(3).]

. . . .

21

Pursuant to Chapter 33-601.735(3) of the Florida Administrative Code, I, as the Warden of FSP (or my designee) approved the ICT's recommendation to continue Mr. Gill's placement on non-contact visitation status on the following dates:

(a) July 31, 2012;
(b) February 12, 2013;
(c) August 22-23, 2013;
(d) February12, 2014;
(e) August 7, 2014;
(f) January 22, 2015;
(g) July 16, 2015;
(h) February 13, 2015;
(i) April 15, 2015;
(j) June 12, 2015;
(k) August 10, 2015;
(l) October 5, 2015;
(m) January 19, 2016; and
(n) July 19, 2016

On said dates and for the reasons stated in [the ICT log], the ICT recommended continuation of Mr. Gill's non-contact visitation status. As Warden, I had the discretion to approve or disapprove [] the ICT's recommendations, and for the reasons stated in this declaration, I approved the ICT's recommendations. Mr. Gill has been permitted non-contact visits. Mr. Gill's placement on noncontact visitation status is due to concerns for public, staff, and inmate safety in the contact setting. Mr. Gill repeatedly violated the trust of prison officials through disciplinary infractions that qualified for non-contact visitation status, and he continuously displayed a negative adjustment that affected our ability to regain his trust during my periodic reviews of Mr. Gill's case, which resulted in continued placement non-contact visitation status.

Mr. Gill has a violent history, pre-incarceration (murder) and postincarceration, including the murder

of his cellmate three days after commencing the sentence for his first murder. Mr. Gill was found guilty of 196 disciplinary reports from 2001 through the present, and an additional 72 disciplinary reports for his previous incarcerations with FD[O]C from 1987 to 1998. Mr. Gill displays a pattern of negative adjustment that warranted continuation in non-contact visitation status.

While serving as the Warden at [FSP] and performing rounds in Mr. Gill's housing and my interactions with him during the ICT review periods, Mr. Gill did not appear remorseful or believable, adding to hesitancy in restoring our trust to return him to a contact visitation status. Mr. Gill's pattern of negative adjustment jeopardized the health and safety of others. Mr. Gill's continued placement on non-contact visitation status was not a punitive action but in line with the correctional system's mission of public, staff, and inmate safety. Mr. Gill appeared to be a clear and present danger that warranted his incapacitation, while incarcerated, in a non-contact visitation status, in an effort to prevent future crimes/offenses, while protecting the rights and privileges of others.

Since January 6, 2017, through the present, I was the Assistant Regional Director of Institutions for Region II, and am presently the Director of Institutions of Region II, which includes UCI where death row inmates are housed, including Mr. Gill. Pursuant to Chapter 33-601.735 of the Florida Administrative Code, Mr. Gill's placement on non-contact visitation status rests with the institution where Mr. Gill is housed, and his non-contact status is reviewed every six months by the ICT, which the warden of UCI can approve or disapprove.

. . . .

Motion Ex. S (paragraph enumeration and exhibit citations omitted). Palmer

no longer participates in Gill's six-month reviews, but explained:

> Inmate Gill's predictably negative, violent, assaultive, lewd and lascivious, and threatening behavior, that has compromised agency trust on not one but multiple occasions, has made any decision to restore contact visitation privileges a very difficult decision for any [ICT] and Warden to make. The ICT's goal is to return inmate Gill to a less restrictive status as soon as it is safe to do so. Inmate Gill is encouraged through time, to continue to put distance between who he has proven to be in the past, and who he says he is now, and regain the trust of those constitutionally charged with his care, custody and control, and the safety and well-being of others.

Motion Ex. T at 5-6.

In his declaration, Defendant Reddish stated:

> From March 2017 through February 2020, I was the Warden of FSP. Since February 2020 through the present, I am the Warden of Lawtey C.I.
>
> Prior to becoming the warden of FSP, Mr. Gill had been permitted contact visits only with his parents, and I had the discretion to continue or discontinue that practice. I decided to continue contact visits with his parents, however, I was not required to by any rule or law. Mr. Gill may be permitted special visits pursuant to Ch. 33-601.733, Fla. Admin. Code., with "special approval" at the Warden's discretion.
>
> I have no authority to order the warden of [UCI] or any other correctional institution to provide contact visits with Mr. Gill's parents. That decision is solely within the authority of the ICT and the warden of the institution where Mr. Gill is presently incarcerated.

24

. . . .

Motion Ex. U at 1-2 (paragraph enumeration omitted).

After Gill's April 30, 2019 transfer to UCI, Defendants Knox, Andrews, Biascochea, and Lamb participated in reviewing and continuing Gill's non-contact visitation status. According to Defendant Knox:

> From October 2016 to the present, I am an Assistant Warden at [UCI].
>
> As an Assistant Warden on the ICT and pursuant to Chapter 33-601.735(3) of the Florida Administrative Code, the ICT reviewed Mr. Gill's non-contact status every six months to evaluate whether changes to his status are necessary based on the [factors in Rule 33-601.735(3).]
>
> . . . .
>
> On May 9, 2019, October 31, 2019, and April 21, 2020, I was on the ICT that reviewed Mr. Gill's status, and in accordance with Chapter 33-601.735(3), the ICT elected to continue Mr. Gill's non-contact visitation status based on his extensive violent history that involves threats and assaults on inmates and staff.
>
> On February 12, 2019, Mr. Gill attempted to conspire to obtain the addresses and aerial plans for the homes of classification officers. Mr. Gill also stated, "I can take 16 other lives and they can't stop me." Mr. Gill wrote an email in reference to an email response I sent that he "got very hot inside and wanted to slap the shit out of [me] the next time [I] walked by [his] cell." Mr. Gill's actions indicate an inability to control his violent temper and feelings, and his continued placement on non-contact visitation status is justified by Mr. Gill's actions and statements.

Mr. Gill's last DR was for spoken threats against me on May 15, 2019. [A]nd although Mr. Gill has not received a DR for over two years and seven months, he remains dangerous and violent. His email proves that he has not gained control over his violent feelings, and given an opportunity, I sincerely believe Mr. Gill would act on them. It was my job on the [ICT] to weigh the facts against the risks and make a decision based on Mr. Gill's history and the factors in Chapter 33-601. 735(3).

Mr. Gill has consistently proven over and over that he is violent, dangerous, and should not be permitted in a contact visitation setting. Mr. Gill has been in FD[O]C custody twice: (1) December 30, 1986, through August 7, 1998, convicted of 72 DRs; and (2) July 20, 2001, through the present, and convicted of 196 DRs.

Mr. Gill's two periods of incarceration with FD[O]C, as of December 28, 2021, totals 32 years and 16 days. Mr. Gill's total incarcerated time of 11,704 days versus the 958 days since May 15, 2019 without a DR totals 8.2% of his total incarceration time, which is [] comparatively a small time period to be without a DR. Since I have not been on the ICT after April 21, 2020, I do not have personal knowledge as to why ICT has maintained Mr. Gill's placement on non-contact visitation.

. . . .

Motion Ex. L at 1-2 (paragraph enumeration and exhibit citations omitted).

In her declaration, Defendant Biascochea stated:

In July 2016, I transferred to [FSP] as a Lieutenant. On October 20, 2017, I was promoted to Captain at [UCI]. On November 30, 2018, I was promoted to Major at UCI. On December 4, 2020, I was

promoted to Colonel at Lowell Correctional Institution where I am currently assigned to and have the same rank.

When I was assigned to FSP, my only interactions with Ricardo Gill, DC# 105559, w[ere] when I conducted my rounds. When assigned to UCI, I interacted with Mr. Gill while also conducting rounds and by being a member of the [ICT], which periodically reviews Mr. Gill's non-contact visitation status.

. . . .

When I was assigned to FSP from July 2016 through October 19, 2017, I was not on the ICT and my duties did not include any responsibility nor authority to recommend, place, or remove Mr. Gill to or from non-contact visitation or contact visitation status. During my tenure at FSP, Mr. Gill was convicted of [ ] ten disciplinary reports[.]

. . . .

When I was assigned to UCI as a Major and pursuant to Chapter 33-601.735(3) of the Florida Administrative Code, the ICT, which included myself, reviewed Mr. Gill's non-contact status every six months to evaluate whether changes to his status are necessary based on [the factors in Rule 33-601.735(3).]

During my tenure at UCI as a Major from November 30, 2018, through December 3, 2020, Mr. Gill was convicted of the following two disciplinary reports:

(a) February 21, 2019 – attempt to conspire; and
(b) May 15, 2019 – spoken threats

Pursuant to Chapter 33-601.735(3) of the Florida Administrative Code, the ICT, which included myself (except on January 14, 2019), reviewed Mr.

27

Gill's noncontact visitation status on the following
dates:

(a) January 14, 2019;
(b) May 9, 2019;
(c) October 31, 2019;
(d) April 21, 2020; and
(e) October 14, 2020.

On said dates and for the reasons stated in the [ICT
log], the ICT elected to continue Mr. Gill's non-contact
visitation status.

When at FSP and UCI . . . , my recollection of
Mr. Gill is that he continuously made verbal threats
during my (and others) rounds towards the prison
administration, which did not indicate a positive
change in his attitude and behavior to be considered
for contact visitation.

. . . .

Motion Ex. H (paragraph enumeration and exhibit citations omitted).

In his declaration, Defendant Andrews explained he has been an FDOC

official for over sixteen years and has been the death row classification officer

at UCI for the past five-and-one-half years. Motion Ex. F at 1. According to

Andrews:

My interactions with Ricardo Gill, DC# 105559
occurred since his transfer to UCI on April 30, 2019,
and in my capacity as a Classification Supervisor,
[ICT] member, and Duty Warden. I make weekly
rounds walking through death row. The interactions I
have had with inmate Gill have been limited to cordial
greetings.

Mr. Gill transferred to [UCI] on non-contact visitation status from his previous institution on April 30, 2019 . . . based upon his murder of a cellmate in 2001 and his lengthy history of assaulting staff, assaulting other inmates, and threatening staff members. He has a documented history on his current prison commitment (last 20 years) of over 30 incidents of battering staff (throwing urine/feces, stabbing, spitting), over 30 incidents of threatening harm to staff or other inmates, and numerous incidents of lewd and lascivious acts towards female staff members. Not long after his arrival at [UCI] he made a threat to slap AW Knox on May 15, 2019. This was in line with his established pattern of behavior and warranted the ICT continuing his non-contact status at the periodic six-month reviews pursuant to Chapter 33.

The ICT at [UCI] has continued inmate Gill's non-contact status at subsequent six-month reviews based upon his well-documented history of extreme violence towards staff and females as cited above. It is our correctional judgment that going a couple years without a disciplinary incident does not erase the preceding dozens and dozens of incidents of violence/threats of violence to staff members, other inmates, and females. Contact visitation is a privilege that death row inmates enjoy without mechanical restraints or barriers from one another or from the visitors present in the visitation area. If the ICT were to reinstate the contact visitation privileges of inmate Gill, that decision could place the officers and visitors in very real potential of danger based upon inmate Gill's established volatility. Any institutional leadership member takes serious[ly] the decision to place visitors and staff at risk of danger and are very cautious in doing so.

. . . .

29

Motion Ex. F (paragraph enumeration omitted). Andrews also stated he has never worked at FSP and does not know why FSP permitted Gill contact visits, but he is not bound by the discretionary actions of FSP or its leadership. Motion Ex. G at 2-3.

Defendant Lamb asserted he has been an FDOC officer since 1994 and has "held every correctional officer rank . . . ." Motion Ex. M at 1. According to Lamb:

> Since February 2020, I have been the Warden of [UCI], where Mr. Gill DC# 105559 is presently housed in the death row wing.
>
> When I started as Warden of [UCI], Mr. Gill was already on noncontact visitation status. Mr. Gill has demonstrated a history of violent behavior that includes violence towards those staff in a supervisory capacity (See 11/25/99 conviction for two counts of battery on a Detention Facility Employee) and 196 DRs. After being convicted and incarcerated for murder, Mr. Gill murdered another inmate for which he received a death sentence. In May 2019 Inmate Gill was found guilty of a disciplinary report for threats against staff in which he ma[de] threatening statements about Assistant Warden Tifani Knox who is still assigned to [UCI]. These threats against staff have been taken very seriously based on this inmate[']s history and out of an abundance of caution Mr. Gill remained on noncontact visitation. If allowed contact visits Inmate Gill would be in the open VP unrestrained and in direct contact with staff, including AWP Knox whom he has threatened, and other inmates.
>
> As Warden of [UCI], Chapter 33 gives me the discretionary authority to approve or disapprove the

ICT's recommendation for Mr. Gill's noncontact visitation status. Given Mr. Gill's history of violence and threats of violence, I have approved Mr. Gill's continuation on non-contact visits. To be removed from non-contact status, Mr. Gill needs to continue on a trajectory of positive adjustment, and two and one-half years of zero DRs, in light [o]f his lengthy time in FD[O]C (over 32 years), is not a sufficient period of time to determine whether Mr. Gill still presents a danger to staff, inmates, and the general public in a contact setting.

. . . .

Motion Ex. M (paragraph enumeration omitted).

In his declaration, Defendant Lindsey stated he began his career at FSP in 1993 and remained there until 2013 when he moved to Marion Correctional Institution. Motion Ex. O at 1. In May 2017, Lindsey became a colonel at UCI where he remains. Id. According to Lindsey, as colonel at UCI, he interacts with Gill when conducting his security rounds on death row, but he is not on the ICT nor has he made any decisions about Gill's non-contact status.[10] Id. Lindsey asserted that while he was assigned to FSP, he helped transport Gill several times and stated Gill was generally compliant during these interactions. Motion Ex. P at 1.

---

[10] Although Lindsey stated in his declaration that he has not made any decisions about Gill's non-contact status, in Lindsey's responses to Gill's interrogatories, he twice commented, "[m]y decisions to maintain [Gill's] non-contact status is based upon the relevant factors set forth in Chapter 33." Motion Ex. P at 1-2.

Defendant Inch stated he has never been a member of an ICT, nor has he made any decisions about Gill's contact or non-contact visitation status. Motion Ex. J at 1. According to Inch, as of December 2021, he is no longer the Secretary of the FDOC, but during his tenure, his duties primarily included large-picture issues about ensuring the FDOC carried out its responsibilities efficiently. Id. at 2. He explained that "[p]lacement or continuation on non-contact status of any prisoner is not a decision [he] was ever involved in," as that decision is "solely within the authority of the [institution's] ICT." Id.

## VI. Summary of Parties' Arguments

In their Motion, Defendants argue they are entitled to summary judgment because: (A) Gill failed to exhaust his administrative remedies; (B) Defendants are entitled to qualified immunity; (C) Gill has failed to establish a due process violation under the Fifth and Fourteenth Amendments; (D) part of Gill's claim is barred by the statute of limitations; (E) Gill has failed to establish supervisory liability on behalf of Defendant Inch; (F) Gill is not entitled to injunctive relief; and (G) Gill is not entitled to declaratory relief. See generally Motion. In response, Gill argues he completed the FDOC's three-step grievance procedure to exhaust his administrative remedies. Resp. at 3. He also asserts he has established a due process violation and Defendants are not entitled to qualified immunity for their unconstitutional conduct. Id. at 4-10. Gill further argues his claims are not barred by the statute of limitations as he

demonstrates a "continuing violation," Defendant Inch personally participated in violating Gill's constitutional rights, and he is entitled to injunctive and declaratory relief. Id. at 11-12.

## VII. Discussion

### A. Exhaustion

Defendants argue they are entitled to summary judgment because Gill failed to exhaust his administrative remedies. Motion at 13-25. The Prison Litigation Reform Act (PLRA) requires Gill to exhaust his available administrative remedies before pursuing a § 1983 claim about prison conditions. See 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted."); see also Woodford v. Ngo, 548 U.S. 81, 92-93 (2006) (noting that a prisoner must exhaust administrative remedies before challenging the conditions of confinement, and concluding that the PLRA demands "proper exhaustion"). But Gill need not "specially plead or demonstrate exhaustion in [his] complaint[]." See Jones v. Bock, 549 U.S. 199, 216 (2007). Instead, the United States Supreme Court has recognized that "failure to exhaust is an affirmative defense under the PLRA[.]" Id.

Importantly, exhaustion of available administrative remedies is "a precondition to an adjudication on the merits." Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008); see also Jones, 549 U.S. at 211. The Supreme Court has

instructed that while "the PLRA exhaustion requirement is not jurisdictional[,]" <u>Woodford</u>, 548 U.S. at 101, "exhaustion is mandatory . . . and unexhausted claims cannot be brought," <u>Pavao v. Sims</u>, 679 F. App'x 819, 823 (11th Cir. 2017) (per curiam) (citing <u>Jones</u>, 549 U.S. at 211).[11] Not only is there a recognized exhaustion requirement, "the PLRA . . . requires proper exhaustion" as set forth in applicable administrative rules and policies of the institution. <u>Woodford</u>, 548 U.S. at 93.

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)."

<u>Id.</u> at 90 (citation omitted). Indeed, "[p]roper exhaustion demands compliance with an agency's deadlines and other critical procedural rules[.]" <u>Id.</u>

Because failure to exhaust administrative remedies is an affirmative defense, Defendants bear "the burden of proving that [Gill] has failed to

---

[11] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060-61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

exhaust his available administrative remedies." Turner v. Burnside, 541 F.3d

1077, 1082 (11th Cir. 2008). The Eleventh Circuit has articulated a two-step

process that the Court must employ when examining the issue of exhaustion

of administrative remedies.

> In Turner v. Burnside we established a two-step
> process for resolving motions to dismiss prisoner
> lawsuits for failure to exhaust. 541 F.3d at 1082. First,
> district courts look to the factual allegations in the
> motion to dismiss and those in the prisoner's response
> and accept the prisoner's view of the facts as true. The
> court should dismiss if the facts as stated by the
> prisoner show a failure to exhaust. Id. Second, if
> dismissal is not warranted on the prisoner's view of
> the facts, the court makes specific findings to resolve
> disputes of fact, and should dismiss if, based on those
> findings, defendants have shown a failure to exhaust.
> Id. at 1082-83; see also id. at 1082 (explaining that
> defendants bear the burden of showing a failure to
> exhaust).

Whatley v. Warden, Ware State Prison, 802 F.3d 1205, 1209 (11th Cir. 2015).

"Proper exhaustion demands compliance with an agency's deadlines and

other critical procedural rules . . . ." Jones v. Bock, 549 U.S. 199, 216 (2007);

see Pavao v. Sims, 679 F. App'x 819, 823 (11th Cir. 2017) ("The prison's

requirements, and not the PLRA, define the boundaries of proper exhaustion,

so 'the level of detail necessary in a grievance to comply with the grievance

procedures will vary from system to system and claim to claim.'" (quoting

Dimanche v. Brown, 783 F.3d 1204, 1211 (11th Cir. 2015)). The only limit to §

1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only

such administrative remedies as are 'available.'" 136 S. Ct. 1850, 1862 (2016). For an administrative remedy to be available, the "remedy must be 'capable of use for the accomplishment of [its] purpose.'" Turner, 541 F.3d at 1084 (quoting Goebert v. Lee Cty., 510 F.3d 1312, 1322-23 (11th Cir. 2007)). In Ross v. Blake, the Court identified three circumstances in which an administrative remedy would be considered "not available." 136 S. Ct. 1850, 1862 (2016). First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. Next, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. For example, the Eleventh Circuit has recognized that an administrative remedy that "is unknown and unknowable is unavailable." Geobert, 510 F.3d at 1323. Finally, a remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross, 136 S. Ct. at 1860.

State law "determines what steps are required to exhaust." Dimanche v. Brown, 783 F.3d 1204, 1207 (11th Cir. 2015); see also Jones, 549 U.S. at 218 (stating that "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion"). In Florida, the FDOC provides an internal grievance procedure for its inmates. See Fla. Admin. Code R. 33-

103.001 through 33-103.018. Generally, to properly exhaust administrative remedies, a prisoner must complete a three-step sequential process. First, an inmate must submit an informal grievance at the institutional level to a designated staff member responsible for the specific problem. See Fla. Admin. Code R. 33-103.005. If the issue is not resolved, the inmate must submit a formal grievance at the institutional level. See Fla. Admin. Code R. 33-103.006. If the matter is not resolved through formal and informal grievances, the inmate must file an appeal to the Office of the FDOC Secretary. See Fla. Admin. Code R. 33-103.007.

Here, Defendants do not dispute that Gill completed the FDOC's typical three-step internal grievance procedure. Motion at 13-25. Instead, they argue Gill did not exhaust his administrative remedies because he failed to file a Petition to Initiate Rulemaking (PIR) under section 120.54, Florida Statutes. Id. at 16. According to Defendants, because Gill challenges the FDOC's administrative rule on non-contact visitation, "[t]he normal prisoner grievance process alone" is "insufficient" to properly notify the FDOC about his claim. Id. They assert that the PLRA requires exhaustion of all available administrative remedies, and since filing a PIR is an available administrative remedy under Florida law, Gill's failure to avail himself of that remedy before initiating this action renders his claims unexhausted and subject to dismissal. Id. at 25. In support of this argument, Defendants submit the declaration of Lauren

37

Sanchez, an FDOC records custodian for PIRs, who declares that the FDOC has no record of Gill ever filing a PIR. Motion Ex. E at 1.

In response, Gill argues he exhausted his administrative remedies because he completed all three steps of the FDOC's grievance procedure before filing the Complaint. Resp. at 3. A review of the exhibits Gill submitted with his Complaint supports his argument. See Doc. 1-2 at 1-15. Gill filed an informal grievance (log # 212-1906-0251), see id. at 1; a formal grievance (log # 1907-213-031), see id. at 10; an administrative appeal (log # 19-6-28870), see id. at 12-14; and the institutional response to each grievance, see id. at 1, 11, 15. According to Gill, the FDOC's internal grievance procedure explicitly outlines the required three-step process for proper exhaustion and the FDOC's procedures do not mention filing a PIR. Id. at 4. Gill asserts that Defendants' attempt to add a step is misleading as no reasonable inmate following the FDOC's internal procedure would ever know that filing a PIR was required. Id. at 3. To that end, Gill appears to assert that if he needed to file a PIR to exhaust his administrative remedies, omitting language referencing the need to file a PIR renders that remedy unavailable. Id. at 3.

The Court finds Gill's allegations and his attached grievances preclude dismissal of this action at the first step of Turner. The Court proceeds to Turner's second step and makes specific findings to resolve the disputed factual issues related to exhaustion. In doing so, the Court looks to Davis v. Inch, 3:17-

cv-820-MMH-PDB, 2019 WL 1400465, at *3-*9 (M.D. Fla. Mar. 28, 2019), in which the Court rejected the same argument Defendants make now. As the Court explained, the Eleventh Circuit has repeatedly stated that the applicable prison grievance system governs the issue of exhaustion, not the PLRA. See Dimanche, 783 F.3d at 1211 ("'[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.'") (quoting Jones, 549 U.S. at 218); see also Gipson v. Renninger, 750 F. App'x 948, 951 (11th Cir. 2018) ("To determine 'proper exhaustion' in prisoner civil rights actions, courts look to the requirements of the 'prison grievance system.' A prisoner must comply with rules 'defined not by the PLRA, but by the prison grievance process itself.'") (internal citations omitted); Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (noting that prisoners must comply with the grievance procedures adopted by the state department of corrections before filing a § 1983 action); Sims v. Nguyen, 403 F. App'x 410, 412 (11th Cir. 2010) (same); Brown v. Sikes, 212 F.3d 1205, 1207 (11th Cir. 2000) (noting that "when a state provides a grievance procedure for its prisoners, as Georgia does here, an inmate . . . must file a grievance and exhaust the remedies available under that procedure") (emphasis added).

Here, the PIR provision that Defendants seek to engraft into the PLRA exhaustion process is not part of the FDOC's internal grievance procedure, rather it is part of Florida's statutory Administrative Procedure Act. See

<u>generally</u> Fla. Stat. Chapter 120. The FDOC's inmate grievance procedure in Florida Administrative Code Rule 33-103 contains no mention of filing a PIR nor does it reference Florida's Administrative Procedure Act. Gill completed the applicable three-step process and he did not have to do anything more to exhaust his administrative remedies. Thus, Defendants' Motion is due to be denied as to the contention that Gill failed to exhaust his administrative remedies.

## B. <u>Due Process</u>

Gill argues that Defendants' actions of approving and continuing his non-contact visitation status under Rule 33-601.735 for the past eighteen years violate his due process rights under the Fifth and Fourteenth Amendments. Complaint at 16-19. Defendants argue they are entitled to summary judgment because the FDOC's policies on visitation do not give rise to a liberty interest in contact visitation. Motion at 34-35. They also assert that even if the FDOC's rules created a liberty interest in such visitation, Gill's due process claim fails because they have complied with all aspects of Chapter 33 when continuing Gill's non-contact status and his documented violent and threatening disciplinary history justifies their decision.[12] <u>Id.</u> at 37-38.

_____

[12] Defendants also appear to construe Gill's Complaint as raising a substantive due process claim. <u>See</u> Motion at 35 (citing <u>Overton v. Bazzetta</u>, 539 U.S. 129 (2003)). But the allegations in the Complaint and his Response make clear that Gill is raising only a procedural due process claim. <u>See</u> Resp. at 8.

"[A] § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003). Courts "examine procedural due process questions in two steps; the first asks whether there exists a liberty or property interest that has been interfered with by the state[;] the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." Kentucky Dep't of Corr. v. Thompson, 490 U.S. 454, 460 (1989) (internal citations omitted); see also Wilkinson v. Austin, 545 U.S. 209, 221-22 (2005).

Liberty interests may arise either from the Due Process Clause or from state law. Meachum v. Fano, 427 U.S. 215, 225-27 (1976). The Due Process Clause does not provide an inmate with a liberty interest or right to "unfettered visitation." See Thompson, 490 U.S. at 460-61 (finding that "[t]he denial of prison access to a particular visitor . . . is not independently protected by the Due Process Clause"); Charriez v. Sec'y, Fla. Dep't of Corr., 596 F. App'x 890, 893-94 (11th Cir. 2015) (holding district court did not err in granting summary judgment as to procedural due process claim because the plaintiff did not have liberty interest in unfettered visitation under the Due Process Clause). Thus, even viewing the facts in the light most favorable to Gill, as the Court must,

he fails to show a violation of a liberty interest protected by the Due Process Clause of its own force.

As a result, to establish a procedural due process violation, Gill must show the FDOC's rules create a liberty interest in contact visitations. To determine whether the state has created a protected liberty interest, the Supreme Court has directed that courts must focus on the nature of the deprivation at issue. Sandin v. Conner, 515 U.S. 472, 481-83 (1995). In evaluating the nature of the deprivation, the Court has instructed that state-created liberty interests rising to the level of requiring due process protection generally will be limited to "freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless impose [] [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484 (internal citations omitted). That is to say, "the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of the regulations regarding those conditions but the nature of those conditions themselves" when compared to the typical conditions of incarceration. Wilkinson, 545 U.S. at 223.

Here, Gill has failed to establish a state created liberty interest in contact visitation because his long-term placement on non-contact visitation

status is not an atypical and significant hardship in relation to ordinary prison life. Notably, "'[v]isitation privileges are a matter subject to the discretion of prison officials.'" Ortiz v. Sec'y, Dep't of Corr., 156 F. App'x 132, 133 (11th Cir. 2005) (quoting McCray v. Sullivan, 509 F.2d 1332, 1334 (5th Cir. 1975)).[13] And "an inmates' federal rights are not violated by the denial or limitation of contact visits when jail administrators determine that such visits pose security risks." Id. Indeed, "[r]unning a prison is an inordinately difficult undertaking" and deference is given to prison authorities charged with the administration of those prisons. Turner v. Safley, 482 U.S. 78, 84-85 (1987) (citations omitted); see also Cruz v. Beto, 405 U.S. 319, 321 (1972) (noting "that prison officials must be accorded latitude in the administration of prison affairs, and that prisoners necessarily are subject to appropriate rules and regulations). "Discipline by prison officials in response to a wide range of misconduct falls within the expected perimeters of the sentence imposed by a court of law." Sandin, 515 U.S. at 485. And placing an inmate on non-contact visitation status under Rule 33-601.735 is an expected and permissible form of prison discipline.

---

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit adopted as binding precedent all decisions of the former United States Court of Appeals for the Fifth Circuit that were rendered prior to the close of business on September 30, 1981.

Here, Defendants assert Gill's initial placement and continuation on non-contact visitation status is due to his documented violent and threatening disciplinary history. Motion at 38-39. The undisputed evidentiary material supports Defendants' argument. The record shows Gill has 196 DR convictions for an array of severe and assaultive offenses, and the ICT repeatedly recommended Gill's continued non-contact visitation status "due to [Gill] being [a] security threat." Motion Ex. W at 39. Among other offenses, Gill murdered his cellmate, attempted to stab a correctional officer, often threw his own urine and feces at those walking past his cell, verbally threatened staff, and attempted to obtain the address and an ariel photograph of a correctional officer's home. See generally Motion Ex. X.

Gill admitted during his deposition that his disciplinary record shows a history of violence. Motion Ex. D at 69. But he stated he has not received a DR since May 2019 and is no longer a security threat. Id. at 70-71. He also argues in his Complaint that officials do not actually consider him to be a security threat because he is not "continuously segregated" and "is allowed open recreation with 75 other inmates and has been allowed [c]ontact [v]isits on a 'case-by-case basis.'" Complaint at 15. Gill testified that he is not housed in a "heightened security cell" but has a typical "cell with just bars," allowing him to see and speak to officials and visitors who walk down the hallway. Motion Ex. D at 64. He also "has day room accessibility with [six] other inmates for

44

[two] hours per week." Supp. Resp. at 4. He contends, however, that his non-contact visitation status poses an "atypical and significant" hardship because other death row inmates "with similar charges and track records" are allowed contact visits. Resp. at 9. But Gill offers no evidence of another death row inmate who is permitted contact visits despite having 196 DR convictions including murdering a cellmate and several violent acts against correctional staff.

Defendants, on the other hand, offer a sworn statement from Defendant Lindsey that "196 DRs for a death row inmate is unusually high, as death row inmates are provided with many amenities that are not available to those in gen. pop or in CM. Generally speaking, death row inmates are well-behaved to maintain or keep those amenities that are not available to other prisoners." Motion Ex. P at 1. In response to Gill's interrogatory asking why UCI officials consider him a security threat when he has attended the recreation yard for over two years without incident, Defendant Biaschocea responded, "Your behavior throughout your incarceration has been unpredictable, and two years in the rec yard without an incident may not be sufficient to remove your non-contact visitation status." Motion Ex. I at 2. In her sworn interrogatory responses, Defendant Knox asserted Gill's visitations with other inmates and visitations with the public are "two different scenarios that must be evaluated in a different way." Motion Ex. K at 2. According to Knox, Gill being placed in

an open bar stock cell at UCI "has nothing to do with non-contact visitation," and she still considers him a threat to maintaining the safety and security in the visiting park despite the type of cell he is housed in. Id.

To that end, according to the undisputed evidence, absent his non-contact visitation status, there is no other condition or combination of conditions demonstrating that Gill's confinement differs from other similarly situated inmates. And the Court cannot find that Gill's denial of a particular type of visitation, without more, establishes a restriction that is "atypical and significant . . . in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. Indeed, Gill's non-contact visitation status does not prohibit all visitations, rather it merely regulates the method of Gill's visitations. The undisputed evidence shows officials regularly approve non-contact visitations for Gill and he enjoyed thirty-six visitation days between February 2013 and February 2020. Motion Ex. X. And some of Gill's visits that occurred between 2017 and 2018 were special contact visits with his mother and father. Motion Ex. D at 17-18, 37. Although Gill has been under Rule 33-601.735's non-contact visitation status for a long time, the other aspects of his confinement are similar to those experienced by other inmates. And there is no evidence that the length of his non-contact status, under the circumstances of his extensive disciplinary record labeling him a security threat, is arbitrary such that different considerations might apply. Thus, Gill has failed to establish a liberty

interest in contact visitation.[14] <u>See, e.g.</u>, <u>Henry v. Dep't of Corr.</u>, 131 F. App'x 847, 849 (3d Cir. 2005) (finding permanent loss of contact visitation did not satisfy <u>Sandin</u> requirement as "it simply regulated the <u>manner</u> of his visits") (emphasis in original); <u>Poulin v. Jeter</u>, No. 6:08-cv-299-Orl-31KRS, 2010 WL 3701384, at *11 (M.D. Fla. Sept. 15, 2010) (finding jail's policy allowing non-contact visits but prohibiting contact visits because jail lacked the "facilities or manpower" did not violate a constitutional right).[15]

In any event, even if Gill's non-contact visitation status poses an atypical and significant hardship in which he has a protected liberty interest, the undisputed evidence shows Gill has been afforded the minimum requirements of due process. "When determining whether a plaintiff was denied due process, [the Eleventh Circuit has] appl[ied] 'a three-part balancing test in which [courts] weigh the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements.'"

---

[14] Gill also argues Florida Administrative Code Rule 33-601.731(a)4 establishes a liberty interest in contact visitation because it states "the suspension of visiting privileges will be a significant detriment to the inmate . . . ." Resp. at 9. But when determining if a state created liberty interest exists, "<u>Sandin</u> made clear that we must consider [the] [p]laintiff's conditions, not the existence or language of prison regulations." <u>Turner v. Warden, GDCP</u>, 650 F. App'x 695, 701 n.4 (11th Cir. 2016).

[15] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. <u>See</u> <u>Stone v. First Union Corp.</u>, 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

Hale v. Sec'y, Dep't of Corr., 345 F. App'x 489, 493 (11th Cir. 2009) (quoting

Sheley v. Dugger, 833 F.2d 1420, 1426 (11th Cir. 1987)).

First, the record demonstrates the ICT at FSP provided Gill with written

notice on July 27, 2004 informing him of its initial recommendation to place

Gill on non-contact visitation status under Rule 33-601.735 "due to [DR] for (9-

26), Refusing to submit to substance abuse testing." Supp. Resp. Ex. B at 2.

Gill does not argue that the ICT failed to then hold a hearing after providing

its notice or that he was not allowed to participate in any initial proceeding.

The record shows the warden approved the ICT's recommendation and Gill has

remained on non-contact visitation status under Rule 33-601.735 since that

July 2004 approval. Motion Ex. D at 61. Gill argues that refusing to submit to

a substance abuse test is not a valid offense qualifying him for non-contact

status under Rule 33-601.735(3); however, the record shows that the same day

Gill received the DR of refusing to submit to a substance abuse test, he also

received a DR conviction for possessing a weapon (a shank), which is a threat

to the institution's security. Motion Ex. X at 76-78; see Fla. Admin. Code R. 33-

601.735(3)(a); see also O'Bryant v. Finch, 637 F.3d 1207, 1213-14 (11th Cir.

2011) (noting that due process merely requires there be some evidence in the

record that could support the conclusion reached by the disciplinary official).

But in this case, Gill is not primarily challenging the procedures

employed to initially place him on non-contact visitation status. Rather, he

attacks the procedures Defendants have used to continue his non-contact visitation status for almost two decades. Although most cases that discuss long-term disciplinary statuses typically involve harsher restrictions like an inmate's lengthy administrative segregation instead of a limitation on visitation rights, the Eleventh Circuit has noted that dicta in Hewitt v. Helms, 459 U.S. 460, 477 n. 9 (1983), overruled on other grounds by Sandin, 515 U.S. at 472, alludes to the type of process required for long-term prison restraints:

> Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner – which will have been ascertained when determining to confine the inmate to administrative segregation – and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner.

Sheley, 833 F.2d at 1426.

Here, the record reflects that Gill has been afforded due process as he has received regular periodic reviews to ensure his retention on non-contact visitation status is warranted. See generally Motion Ex. W. Gill argues the ICT did not conduct the required six-month periodic reviews of his non-contact visitation status for eleven and a half years – from July 19, 2005 to January 19, 2016. Complaint at 15. The record shows, however, that during that

timeframe, Gill's visitation status was not only limited to non-contact under Rule 33-601.735 but was also restricted because of the 130 DR convictions he accumulated during that time and the resulting classification changes that, by their own effect, limited his visitation. <u>See</u> Motion Ex. W.

Indeed, the ICT log shows that because Gill attempted to stab a correctional officer, officials placed Gill on MM in August 2005, and he remained on MM until January 26, 2009. Motion Ex. W at 45-53. Inmates on MM are not eligible for contact visitations and must receive monthly classification reviews, as opposed to Rule 33-601.735's six-month reviews. Although Gill's monthly MM reviews are not at issue in this case, a review of the record shows that officials regularly reviewed Gill's MM status. Indeed, while the ICT log includes no record of a classification hearing between September 2005 and November 2006, the state court ordered officials to transport Gill for several court appearances between June 2005 and June 2006, and thus he was not continuously in the FDOC's custody during that timeframe. The ICT log does show, however, that Gill received monthly classification reviews starting in December 2006 until his release from MM in January 2009. Motion Ex. W at 45-53.

Six months later, in July 2009 officials placed Gill in AC because he obtained five DR convictions between May and June 2009. The ICT then reviewed Gill's non-contact visitation status in November 2009 and conducted

twelve more reviews between June 2010 and January 2016. Id. at 36-38. Further, according to Defendant Palmer, he has "no reason to believe [Gill's six-month] reviews did not occur in accordance with the rule" between July 2005 and January 2016. Motion Ex. T at 2. And the ICT log supports that statement.

In sum, officials provided Gill with written notice of his initial placement on non-contact visitation status, and the record shows he has received and continues to receive six-month periodic reviews of his non-contact status in accordance with Rule 33-601.735(4). See Moton Ex. W at 26. The ICT has always explained that Gill's non-contact visitation status results from his numerous major DR convictions and is imposed for the safety and security of the facility. This undisputed evidence shows Gill received adequate due process and thus Defendants' Motion is due to be granted.[16] See, e.g., Morefield v. Smith, 404 F. App'x 443, 446 (11th Cir. 2010) (finding inmate who spent four years in administrative segregation received all process due as prison gave him notice, opportunity for rebuttal at initial hearing, and periodic reviews of his status); see also Al-Amin v. Donald, 165 F. App'x 733, 739 (11th Cir. 2006)

---

[16] In his Response, Gill, for the first time, challenges the validity of the two DR convictions obtained in April and May 2019. Resp. at 6. But Gill cannot raise new claims at the summary judgment stage, and thus the Court declines to consider that argument. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004).

(finding inmate received minimum requirements of due process because he was afforded periodic reviews of his confinement).

## C. Supervisory Liability Claims

Because the Court finds no constitutional violation occurred, the Court need not address Gill's official capacity or supervisory liability claims. See Knight through Kerr v. Miami-Dade Cnty., 856 F.3d 795, 821 (11th Cir. 2017) ("There can be no policy-based liability or supervisory liability when there is no underlying constitutional violation.").

## D. Statute of Limitations

Defendants argue that any portion of Gill's claim involving conduct that allegedly occurred before May 29, 2016 is barred by Florida's four-year statute of limitations. Motion at 40-41. The Court previously rejected this argument when denying Defendants' motion to dismiss, finding Gill adequately alleged a "continuing violation" that may extend the limitations period. See Order (Doc. 42). See, e.g., Johnson v. City of Warner Robins Ga., No. 5:15-CV-419(CAR), 2018 WL 1095563, at *9-*15 (M.D. Ga. Feb. 28, 2018) (finding due process claim based on four-and-one-half-year administrative segregation was continuing violation for statute of limitations purposes). The Court rejects this argument for the reasons already stated in that Order. See Doc. 42.

E. <u>Remaining Arguments</u>

Because the Court finds Defendants' Motion is due to be granted as to their argument that no constitutional violation occurred, the Court need not address Defendants' qualified immunity argument or Gill's request for declaratory or injunctive relief.

Therefore, it is now

**ORDERED AND ADJUDGED**:

1.      Gill's Motion to Compel Discovery (Doc. 97) is **DENIED** as untimely filed.[17]

2.      Defendants' Motion for Summary Judgment (Doc. 83) is **GRANTED in part and DENIED in part** as stated herein.

3.      The Clerk is directed to enter judgment in favor of Defendants Inch, Palmer, Reddish, McClellan, Lamb, Knox, Andrews, Lindsey, and Biascochea and against Plaintiff Gill; terminate any pending motions; and close the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 9th day of March, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

Jax-7
C:    Ricardo Ignacio Gill, #105559
      Omar J. Famada, Esq.

---

[17] Gill filed his Motion to Compel on February 28, 2023, see Doc. 97, well after the discovery deadline of March 18, 2022, see Doc. 78 at 3. Thus, Gill's Motion to Compel is untimely filed. Also, Gill seeks the "actual ICT board decisions," Doc. 97 at 2; but the Court has considered the ICT log containing a summary of the ICT's decisions in ruling on Defendants' Motion.